IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

GEORGE D. HOUSER and
RHONDA HOUSER,

             Defendants.

CRIMINAL ACTION FILE

NO. 4:10-CR-012-HLM-WEJ

## NON-FINAL REPORT AND RECOMMENDATION

    This matter is before the Court on defendants' joint Motion to Dismiss Indictment [77].[1] Count one of the First Superceding Indictment charges defendants with conspiracy (18 U.S.C. § 1349) to defraud health care benefit programs in violation of 18 U.S.C. § 1347. Defendants seek to dismiss count one, arguing that § 1347 is unconstitutionally vague as applied to them.[2] For the reasons set forth

---

    [1] The Housers filed another joint Motion to Dismiss [76] count one, asserting that it omitted an essential element of the charged offense. However, the Housers abandoned that Motion after the grand jury returned a First Superceding Indictment [86] alleging that defendants defrauded health care benefit programs affecting commerce. (See First Superceding Indictment ¶ 1 ("Supr. Indict.").)

    [2] The undersigned does not address the remaining counts (two through eleven) in this Report, as the instant joint Motion to Dismiss does not challenge them. Moreover, those counts are relevant only to Mr. Houser, alleging that he failed to pay federal income taxes and Federal Insurance Contributions Act taxes between August

below, the undersigned **RECOMMENDS** that defendants' joint Motion to Dismiss

Indictment [77] be **DENIED**.

## I.   THE FIRST SUPERCEDING INDICTMENT

### A.   Count One

On January 18, 2011, the grand jury returned an eleven-count First

Superceding Indictment with a forfeiture provision against the Housers concerning

conduct allegedly occurring in this District and elsewhere. (See generally Supr.

Indict.) Only count one pertains to both Mr. and Mrs. Houser, alleging that, at least

as early as June 2004, and continuing until about September 2007, they knowingly

conspired to execute and attempt to execute a scheme to defraud health care benefit

programs affecting commerce, and to obtain by false representations payment for the

delivery of worthless services in violation of 18 U.S.C. § 1347. (Id. ¶¶ 1, 36.)

### B.   Background Allegations

#### 1.   The Facilities

Mr. Houser created Forum Healthcare Group, Inc., located in Rome, Georgia,

("Forum Healthcare") in March 2003. (Supr. Indict. ¶ 2.) Through Forum

---

2004 and August 2005, and failed to file income tax returns for 2004 and 2005. (See
Supr. Indict. ¶¶ 96-101.)

AO 72A
(Rev.8/8
2)

Healthcare, Mr. Houser owed and managed three nursing home facilities (collectively, "the Facilities") doing business as Mount Berry Convalescent Center ("Mount Berry"), Moran Lake Convalescent Center ("Moran Lake"), and Wildwood Park Nursing and Rehabilitation Center ("Wildwood").  (Id.)  The Facilities had federal and state nursing home licenses and were certified to participate in the Medicare[3] and Georgia Medicaid[4] programs ("the Programs").  (Id. ¶¶ 2, 5.)  Most of the Facilities' residents received assistance from the Programs, which paid nearly all of the per diem revenue the Facilities collected with minimal additional reimbursements from private sources.  (Id. ¶ 15.)

In April 2004, Mr. Houser created Forum Group Corporation ("Forum Group"), also located in Rome.  (Supr. Indict. ¶ 3.)  In July 2004, Mr. Houser began

---

[3] Medicare provides basic medical coverage to individuals age sixty-five or older and to certain disabled persons. (Supr. Indict. ¶ 13.)  The Centers for Medicare and Medicaid Services ("CMS"), an agency within the United States Department of Health and Human Services ("HHS"), administers Medicare through contractors. (Id.)

[4] Georgia Medicaid, administered by the Georgia Department of Community Health, Division of Medical Assistance, provides health care services and benefits to those who cannot otherwise afford them. (Supr. Indict. ¶ 14.)  Georgia Medicaid is funded jointly by the State and HHS.  (Id.)

3

managing the Facilities via Forum Group and changed their names to reflect the same (e.g., Forum Group at Mount Berry).  (Id. ¶ 4.)

Mr. Houser owned, and served as the Chief Executive Officer of, Forum Healthcare, Forum Group, and the Facilities.  (Supr. Indict. ¶ 10.)  Mrs. Houser served as the Corporate Secretary of Forum Healthcare and Forum Group and, along with Mr. Houser, managed the Facilities.  (Id. ¶ 11.)  Additionally, Mrs. Houser is a licensed real estate agent and worked on commission for Re/Max during the events at issue.  (Id.)

On June 15, 2007, the Programs terminated Mount Berry and Moran Lake as participants for failing to be in substantial compliance with participation requirements.  (Supr. Indict. ¶¶ 6-7.)  On September 13, 2007, the Programs terminated Wildwood for the same reason. (Id. ¶ 8.) During their operation, between 2003 and 2007, the Facilities submitted claims for reimbursement under provider numbers assigned to them by the Programs.  (Id. ¶ 9.)

4

## 2.    Agreements With The Programs

Nursing homes that participate in the Programs must meet specific requirements and are surveyed periodically to ensure compliance with applicable federal and state regulations.  (Supr. Indict. ¶¶ 16-26.)  Nursing homes that do not comply with those regulations are subject to sanctions, such as denial of payment or termination from the Programs.  (Id. ¶ 27.)

On July 1, 2004, Mr. Houser, acting as President of Forum Group, submitted Provider/Supplier Enrollment Applications to Medicare on behalf of the Facilities. (Supr. Indict. ¶ 28.)  Acceptance to Medicare allowed the Facilities to file claims for services provided to residents who qualified for those funds.  (Id.)  In signing those applications, Mr. Houser agreed to abide by applicable laws and regulations, and certified as follows: "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."  (Id. ¶ 29.)

Mr. Houser also signed Health Insurance Benefit Agreements for the Facilities with HHS.  (Supr. Indict. ¶ 30.)  Mrs. Houser signed the same Agreement on behalf of Wildwood.  (Id.)  Those Agreements stated that, in order to receive payments, the provider "agrees to conform to the provisions of Section 1866 of the Social Security

AO 72A
(Rev.8/8
2)

Act and applicable provisions in 42 CFR."  (<u>Id.</u>)  Similarly, the Housers submitted applications to enroll the Facilities in the Georgia Medicaid program, requiring them to agree that the Facilities would abide by federal and state laws governing the Programs.  (<u>Id.</u> ¶¶ 31-34.)

Federal and state statutes and regulations mandate that nursing home facilities comply with requirements relating to the provision of services and quality of care. (Supr. Indict. ¶¶ 17-27.)  For example, "'[a] nursing facility must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident.'"  (<u>Id.</u> ¶ 17 (quoting 42 U.S.C. § 1396r(b)(1)(A).)  Likewise, "providers may not submit claims for services that are 'of a quality which fails to meet professionally recognized standards of health care.'" (<u>Id.</u> ¶ 18 (quoting 42 U.S.C. § 1320c-5(a)(2).)

Beginning on May 1, 2003, the Facilities submitted electronic claims for payment to the Programs.  (Supr. Indict. ¶ 35.)  Those claims contained the following notices:

> NOTICE: ANYONE WHO MISREPRESENTS OR FALSIFIES ESSENTIAL INFORMATION REQUESTED BY THIS FORM MAY UPON CONVICTION BE SUBJECT TO FINE AND IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW.

> For Medicaid purposes:
>
> This is to certify that the foregoing information is true, accurate, and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

(Id.)

### 3.   Diversion Of Funds

After they began operating and managing the Facilities, the Housers took control of the Facilities' bank accounts and denied administrators access to them. (Supr. Indict. ¶ 67.)   In January 2004, Mr. Houser purchased two Mercedes automobiles (one each for himself and Mrs. Houser) with monies from those accounts.  (Id. ¶ 68.)

Between October 2004 and October 2005, the Housers paid Mr. Houser's ex-wife $3,552.15 every two weeks from Forum Healthcare's payroll account; however, his ex-wife was not employed by Forum Healthcare. (Supr. Indict. ¶ 69.) Similarly, between January and May 2005, the Housers paid their children's care giver $10,566.76 from Forum Healthcare and Forum Group accounts; that person also was not a corporate or facility employee. (Id. ¶ 70.) Additionally, between July 2004 and

7

June 2005, the Housers issued at least $100,000 in payments to Mrs. Houser for her personal use.  (Id. ¶ 71.)

On June 14, 2004, Mr. Houser transferred $1.4 million from Forum Healthcare's bank account to his personal bank account.  (Supr. Indict. ¶ 72.) Between June 2004 and February 2005, Mr. Houser purchased properties in Atlanta and Rome, paying almost $1.4 million in total down payments and purchasing a property listed at over $1 million outright.  (Id. ¶¶ 72-75.)  Mrs. Houser served as the buyer's agent on those real estate transactions and received nearly $100,000 in commissions.  (Id.)  Additionally, on July 12, 2005, Mr. Houser purchased property in Rome by using two Medicare checks (totaling $108,924.66) as earnest money. (Id. ¶ 76.)  Mrs. Houser received a commission of $8,635 on that transaction as well. (Id.)

AO 72A
(Rev.8/8
2)

### 4.    <u>Conditions At The Facilities</u>

The Facilities had several different administrators during the alleged conspiracy. (Supr. Indict. ¶ 38.) Those administrators alerted the Housers about the Facilities' conditions almost daily via telephone, e-mail, and facsimile. (<u>Id.</u>) The Housers affirmatively ignored those alerts, sometimes throwing away faxed memorandums unread. (<u>Id.</u>) Some of the administrators became frustrated and resigned, interpreting the Housers' failure to respond as a lack of concern about the substandard conditions at the Facilities. (<u>Id.</u>)

Administrators and employees purchased food, bread, milk, and supplies for the Facilities with their own funds and paid for repairs, later requesting reimbursement from the Housers. (Supr. Indict. ¶ 52.) For example, in December 2006, Mount Berry's administrator requested that the Housers reimburse her for a water heater igniter (purchased as a repair). (<u>Id.</u> ¶ 53.) In response, she received an email stating that "employees should not be using personal funds to operate the business." (<u>Id.</u>)

Likewise, the Housers owed considerable sums to many of the Facilities' vendors and crucial services to residents were curtailed as a result. (Supr. Indict. ¶ 55.) The Facilities' administrators requested via telephone, email, and facsimile that

9

the Housers pay delinquent vendor accounts.  (Id. ¶ 56.)  However, the Housers routinely failed to pay the Facilities' expenses as they came due, including those for food, clinical laboratory services, medical waste disposal, trash disposal, pharmacy services, and nursing supplies.  (Id.)  Likewise, the Housers failed to pay for necessary repairs to washing machines, clothes dryers, water heaters, air conditioners, and a leaking roof.  (Id.)

In a December 13, 2004 letter, Mount Berry's fire alarm monitoring service notified Mr. Houser that it had discontinued service due to outstanding invoices. (Supr. Indict. ¶ 57.)  On December 15, Mr. Houser emailed Mount Berry's administrator a list of unpaid vendors stating as follows:

> I'm planning to pay these early next week to return the home to normalcy.  Would this do it?  Is anyone left off the list that should be on it?  Is anyone on the list that should be left off?  I'm doing this because I don't want the State to think I am not paying the bills and try to remove Forum, although some apparently think they should.

(Id.)

The Facilities had constant food shortages.  (Supr. Indict. ¶ 58.)  Based on the number of residents at Mount Berry and Moran Lake, those two facilities spent significantly less per resident on food than the national average for nursing homes. (Id.)  In June 2005, Mounty Berry and Moran Lake contracted with Sysco Food

Services for food delivery because their prior food vendor, U.S. Foodservice, would no longer do business with them due to their delinquent accounts. (Id. ¶ 59.) However, Mount Berry and Moran Lakes's accounts with Sysco also became delinquent, and Sysco notified them that food services may be cancelled. (Id. ¶ 61.) In response, Mr. Houser sent Sysco a signed personal financial statement dated May 2, 2006, indicating that his net worth was more than $26 million. (Id.)

Likewise, Mount Berry and Moran Lake's accounts with Georgia Power became delinquent. (Supr. Indict. ¶ 62.) Beginning in January 2007, Georgia Power shut off power at locations inside Mount Berry and Moran Lake that it believed would not impact the immediate health and welfare of their residents, such as the laundry rooms and storage area. (Id. ¶ 63.) Georgia Power also canceled service at Forum Group's corporate office. (Id.)

### 5.    Treatment Of The Facilities' Employees

The Housers also failed to pay the Facilities' employees timely, resulting in staffing that was inadequate to provide necessary care and jeopardizing the health and physical condition of residents. (Supr. Indict. ¶ 40.) Beginning in late 2004, the Housers deposited insufficient funds into the Facilities' payroll accounts, causing some employees' pay checks to bounce. (Id. ¶ 41.) The situation worsened in 2005,

AO 72A
(Rev.8/8
2)

when the Housers decreased the amount of funds they deposited into those accounts and sometimes made late deposits.  (Id.)  Employees complained to the payroll manager, who relayed those complaints to the Housers.  (Id.)

On February 3, 2006, the Facilities' administrators faxed a memorandum to the Housers requesting that they reliability fund the payroll account.  (Supr. Indict. ¶ 42.)  On June 16, Mount Berry's administrator faxed the Housers a memorandum stating that she and her staff would no longer sign employee pay checks unless they were assured that sufficient funds were available to reimburse those checks.  (Id. ¶ 43.)  On July 5, Mount Berry's administrator faxed the Housers a memorandum stating that several managers had resigned because of the payroll situation.  (Id. ¶ 44.)  That month, the Housers employed a mobile check cashing service, EMK Group Limited, for the Facilities.  (Id. ¶ 45.)  When the "money van" arrived, employees would rush out of the Facilities to cash their paychecks.  (Id.)

At various times, the Housers failed to pay Social Security and payroll taxes and failed to remit health insurance premiums on behalf of the Facilities' employees, while still deducting those monies from their paychecks.  (Supr. Indict. ¶ 49.)  On July 13, 2005, Mount Berry's administrator faxed a memorandum to the Housers relaying complaints that the health insurance premiums deducted from employees'

12

paychecks were not being remitted to their insurers.  (Id. ¶ 50.)  On September 14, that administrator again faxed the Housers to inform them of employees' complaints that their health benefits claims were being rejected for lack of insurance.  (Id. ¶ 51.)

**6.   ORS Surveys**

The Georgia Department of Human Resources's Office of Regulatory Services ("ORS") periodically surveyed the Facilities to ensure compliance with federal and state regulations.  (Supr. Indict. ¶ 25.)  ORS received numerous complaints from the Facilities' staff, vendors, and residents' family members.  (Id. ¶ 82.) ORS repeatedly documented problems and deficiencies at the Facilities, including significant weight loss in many of the residents.  (Id.)  The Facilities provided ORS with plans to correct those deficiencies.  (Id. ¶ 83.)  However, the deficiencies re-occurred and ORS again cited the Facilities, which either temporarily corrected the problems or promised (but failed) to make corrections.  (Id. ¶ 84.)

In May 2007, ORS again surveyed Mount Berry and Moran Lake due to an increase in the volume and severity of complaints.  (Supr. Indict. ¶ 85.)  A May 23 ORS survey of Mount Berry identified two "immediate jeopardies" regarding nutrition and administration and nineteen other deficiencies.  (Id. ¶ 87.)  An immediate jeopardy situation is one in which a "provider's non-compliance with one

AO 72A
(Rev.8/8
2)

or more requirements of participation [in Medicare and Medicaid] has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident."  42 C.F.R. § 489.3.

Likewise, a May 23, 2007 ORS survey of Moran Lake revealed five immediate jeopardies in addition to other deficiencies.  (Supr. Indict. ¶ 86.)  The following conditions at Moran Lake were labeled immediate jeopardies: (1) "Sanitary conditions with respect to food preparation and service;" (2) "Infection control and the failure to ensure the process[ing] & handling of laundry and linen in a manner that prevented the potential spread of infection;" (3) "Governing Body failed to ensure the provision/payment of basic necessities to ensure kitchen and laundry sanitation, as well as dietary and environmental needs of the residents;" (4) "Facility failed to maintain a quality assurance program that identified and implemented corrective measures for repetitive and long term problems;" (5) "Facility failed to ensure that automatic release door mechanisms were functioning properly to allow residents & staff to exit the building during emergencies[.]" (Id.)

In a June 8, 2007 statement, CMS informed the administrators of Mount Berry and Moran Lake of ORS's formal findings and required substantial compliance with correction plans by June 15.  (Supr. Indict. ¶ 88.)  On June 15, CMS notified those

administrators that Mount Berry and Moran Lake were terminated from the Programs effective immediately.  (Id. ¶ 89.)

On August 20, 2007, ORS conducted a follow-up survey of Wildwood and determined that, while immediate jeopardy situations identified two weeks earlier had been corrected, the nursing home was not in substantial compliance with requirements for participation in the Programs.  (Am. Compl. ¶ 90.)  ORS directed Wildwood to execute a correction plan.  (Id.)  A September 4, 2007 survey identified immediate jeopardy situations at Wildwood; on September 10, 2007, CMS informed Wildwood's administrator that the facility was terminated from the Programs.  (Id. ¶ 91.)

Between June 2004 and September 2007, the Facilities submitted claims for care and services to the Programs, which in turn paid the Facilities more than $30 million.  (Supr. Indict. ¶¶ 92, 95.)  The Housers had actual knowledge that the care and services provided by the Facilities were so inadequate or deficient as to be worthless.  (Id. ¶ 93.)

AO 72A
(Rev.8/8
2)

## II.   **CONTENTIONS OF THE PARTIES**

The Housers argue that 18 U.S.C. § 1347 is unconstitutionally vague as applied to them and generally is not applicable to nursing homes, which provide bundled services as opposed to individual services. (Mot. Dismiss Indict. 1-6.) The Housers assert that they could not have committed fraud because the Facilities were reimbursed for residents' care on a per diem rate. (Id. at 5-6.) Defendants contend that neither § 1347 nor regulations governing the Facilities provide notice that, or a standard to indicate when, deficiencies in some services could result in overall care being characterized as worthless, thereby resulting in criminal liability. (Id. at 6-8, 14-15; Defs.' Reply [93] 4-6.)

The Government argues that, by signing participation agreements with the Programs, the Housers acknowledged that they would abide by applicable regulations and would not knowingly present fraudulent claims for services not rendered. (Gov't Resp. [83] 8.) According to the Government, defendants had notice of the Programs' requirements and could have determined when the services rendered by the Facilities were so substandard as to be worthless. (Id. at 9.)

AO 72A
(Rev.8/8
2)

### III.   **DISCUSSION**

#### A.   **The Void-For-Vagueness Doctrine**

The Supreme Court has instructed that to satisfy due process concerns and avoid vagueness, a penal statute must both (1) "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited," and (2) do so "in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983); see also United States v. Di Pietro, 615 F.3d 1369, 1371 (11th Cir. 2010). Additionally, the Court has recognized the second prong of the void-for-vagueness doctrine as more important because it prevents "'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" Kolender, 461 U.S. at 358 (quoting Smith v. Goguen, 415 U.S. 566, 575 (1974)); see also United States v. Fisher, 289 F.3d 1329, 1333 (11th Cir. 2002). Where a statute falls below these standards, a criminal defendant may challenge it as unconstitutionally vague on its face or as applied to his own individual facts and circumstances. Di Pietro, 615 F.3d at 1371. The Housers propound the later argument as to count one of the First Superceding Indictment, which alleges that they engaged in a conspiracy to defraud the Programs in violation of 18 U.S.C. § 1347 by submitting reimbursement claims

17

for nursing care services they knew were so deficient as to be worthless.  (See Supr.

Indict. ¶¶ 1, 92-95.)

**B.**     **Section 1347 And The Worthless Services Doctrine**

Section 1347 provides as follows:

(a) Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice–

> (1) to defraud any health care benefit program; or

> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.

(b) With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.

18 U.S.C. § 1347(a)-(b).  Section 1347 clearly applies to instances where a provider

submits claims for individual services that were not performed.  See United States

v. Soto, 399 F. App'x 498, 500-01 (11th Cir. 2010) (per curiam) (upholding health

18

care fraud conspiracy conviction where defendant billed Medicare for equipment and services never provided to patients).   The question here is whether § 1347 is unconstitutionally vague as applied to the Housers' claims for reimbursement of allegedly deficient bundled services.

In <u>United States v. NHC Health Care Corp.</u>, 163 F. Supp. 2d 1051 (W.D. Mo. 2001), the court explained the difficulty of assessing fraud in the provision of bundled nursing home services under the analogous False Claims Act ("FCA")[5] as follows:

> The difficulty in proving that Defendants committed such a fraud lies in the per diem billing system utilized under Medicare/Medicaid. Obviously, if NHC billed the Government $4 for turning Resident 1 on July 18, 1998, but in fact no one actually performed the task, a clear cut case of fraudulent billing would be presented. However, we are not blessed with such pristine circumstances. NHC billed the Medicare/Medicaid programs for the over-all care of each of these residents on a per diem basis. As previously stated by this Court, in so doing NHC agreed to provide "the quality of care which promotes the maintenance and the enhancement of the quality of life." *Id.* at 1153. At some very blurry point, a provider of care can cease to maintain this standard by failing to perform the minimum necessary care activities required to promote the patient's quality of life. When the provider reaches that point, and still presents claims for reimbursement to

---

[5] The FCA imposes civil liability, as opposed to criminal liability, for knowingly presenting, or causing to be presented, a fraudulent claim for payment to the Government, or for making a false statement in order to be paid for such a claim. 31 U.S.C. § 3729(a)(1)(A)-(B).

AO 72A
(Rev.8/8
2)

Medicare, the provider has simply committed fraud against the United States. Whether the Government has demonstrated that a factual dispute remains as to whether NHC crossed into this admittedly grey area, is the proper focus of this Order.

163 F. Supp. 2d at 1055-56.

Other courts examining similar allegations of fraud under the FCA have reached the same conclusion–at some point, services rendered by a nursing home can be "so deficient that for all practical purposes it is the equivalent of no performance at all." Mikes v. Straus, 274 F.3d 687, 703 (2d Cir. 2001). Thus, billing for such "worthless services" is fraud. See id.; United States ex rel. Lee v. SmithKline Beecham, Inc., 245 F.3d 1048, 1053 (9th Cir. 2001); United States ex rel. Swan v. Covenant Care, Inc., 279 F. Supp 2d 1212, 1221 (E.D. Cal. 2002); cf. James E. Utterback, Substituting an Iron Fist for the Invisible Hand: The False Claims Act and Nursing Home Quality of Care, 10 Quinnipiac Health L.J. 113, 156 (2007) (suggesting that "[p]roof in a worthless services claim should go to the very essence of the basis for which payment was made, supporting the argument that the government would not pay if it had known. . . .[i.e.,] evidence that the quality of care in an isolated event fell so far below the norm as to be grossly negligent or reckless in conduct. Such proof also may be established by showing a pattern of less

20

AO 72A
(Rev.8/8
2)

egregious but widespread substandard quality findings that in the aggregate would give rise to an immediate jeopardy citation.").

However, the undersigned and the parties have found only one criminal case applying the so called "worthless services doctrine"– United States v. Wachter, No. 4:05CR667SNL, 2006 WL 2460790, at *11 (E.D. Mo. Aug. 23, 2006) (noting that "Defendants do no assert, and the court cannot find, any cases where [the worthless services] theory was applied to criminal charges"); see also Devin S. Schindler, Pay for Performance, Quality of Care and the Revitalization of the False Claims Act, 19 Health Matrix 387, 400 (2009) (summarizing development of worthless services doctrine via NHC Health Care Corp. and its progeny, and predicting that "health care facilities which consistently fail to meet whatever standard of care the Federal government currently considers appropriate[] are at risk of both malpractice claims . . . and of being charged with either civil or criminal billing fraud").

Like the Housers, the defendants in Wachter (four nursing home facilities and their director) were charged with conspiring to defraud Medicare in violation of § 1347 by submitting reimbursement claims for services that were "of a quality which fail[ed] to meet professionally recognized standards of health care."  2006 WL 2460790, at *9 (internal quotations omitted).  Also like the Housers, those defendants

21

moved to dismiss the indictment based on vagueness grounds.  The <u>Wachter</u> court

denied their motion, citing the use of the worthless services doctrine in similar civil

fraud claims and concluding as follows:

> Applying the "worthless services" doctrine to the criminal statutes the indictment alleges defendants conspired to violate does not render them void for vagueness.  "Worthless" is defined as "[t]otally lacking worth; of no use or value." *Black's Law Dictionary*, (8th ed. 2004).   Value means "[t]he significance, desirability, or utility of something."  *Id.*  These are common terms whose definition is readily known to ordinary men.  Worthless services could include services that were so deficient that they were of no utility to the resident, or were totally undesirable.

> Here, "men of common intelligence" could reasonably understand when their conduct could result in worthless services, or services completely lacking value.  "Objections to vagueness . . . rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk."  "In determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct [with] which a defendant is charged."  Here, the indictment alleges that defendants concealed and misrepresented the conditions and care provided.  In light of these alleged facts, defendants were on notice that their conduct was at risk for criminal liability.

<u>Id.</u> at *11 (citations omitted).

Additionally, the <u>Wachter</u> court reasoned that any difficulty in distinguishing

between merely bad nursing care services and those that were worthless was

mitigated by § 1347's scienter requirement.   2006 WL 2460790, at *11-12

(observing that notice of possible criminal liability and knowledge that care was substandard could be inferred from defendants' attempts to conceal the poor conditions). While a scienter requirement does not necessarily validate a criminal statute against all vagueness challenges, it does eliminate the objection that the statute punishes the defendant for an offense of which he was unaware. Colautti v. Franklin, 439 U.S. 379, 395 (1979) ("This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*."); Screws v. United States, 325 U.S. 91, 102 (1945) ("The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware."); see also United States v. Conner, 752 F.2d 566, 574 (11th Cir. 1985) (citing those cases in vagueness inquiry).

Although the Eleventh Circuit has not addressed bundled services fraud, it has addressed the *mens rea* required to prove health care fraud in violation of § 1347. In United States v. Medina, 485 F.3d 1291 (11th Cir. 2007), the Circuit held that, "in a health care fraud case, the defendant must be shown to have known that the claims

submitted were, in fact, false."   485 F.3d at 1297 (adopting Tenth Circuit's "knowledge of falsity" requirement as set forth in United States v. Laughlin, 26 F.3d 1523, 1525-26 (10th Cir. 1994)).  In Medina, the Eleventh Circuit upheld the health care fraud convictions of a provider-owner who signed Medicare applications in which she agreed to follow all applicable rules and regulations, but then violated those regulations by paying kickbacks for patient referrals.  Id. at 1297-1300. However, the Circuit overturned the convictions of the provider's employees who, although they submitted reimbursement claims, were not shown to have knowledge of the illegal kickbacks. Id. The Circuit explained the different outcomes as follows: "[W]e cannot hold that [paying kickbacks] alone is sufficient to establish health care fraud without someone making a knowing false or fraudulent representation to Medicare." Id. at 1298.

In light of the above case law (and lack thereof), the Court must consider whether the Housers had actual notice that billing the Programs for the Facilities' substandard services violated § 1347, and whether there are appropriate standards in place to guide the enforcement of that section here.

24

### C.   Section 1347 Can Constitutionally Be Applied To The Housers

The Housers are charged with knowingly neglecting the Facilities to the point where the services rendered fell below the minimum necessary simply to maintain residents' quality of life, while continuing to seek reimbursement for those services. Defendants filed provider applications and benefits agreements with the Programs on behalf of the Facilities.  (See Supr. Indict. ¶¶ 28-35.)  In doing so, the Housers agreed to abide by the rules and regulations governing the Programs, including requirements that providers at least maintain "the quality of life of each resident" and not submit claims for services that are "of a quality which fails to meet professionally recognized standards of health care."  (Id. ¶¶ 17-35.)

However, viewing the allegations in a light most favorable to the Government, conditions at the Facilities were so poor–i.e., food shortages, limited electricity, poor sanitary conditions, staff shortages, safety concerns, etc.–that, in essence, any services actually rendered were of no value.  The Housers knew of those conditions, but did not rectify them.  Rather, the Housers diverted more than $1.4 million in funds from Forum Healthcare's bank account for their personal use (including real estate and automobile purchases, payments to Mr. Houser's ex-spouse, and child care expenses, etc.).  Left with limited funds to run the Facilities, the Housers made

25

AO 72A
(Rev.8/8
2)

sporadic and late payments to employees and vendors, or no payments at all, resulting in limited or no services to residents.  Meanwhile, the Housers continued to submit reimbursement claims to the Programs for the Facilities' services.

With regard to actual notice, under the above circumstances, ordinary people would have understood that the overall conditions at the Facilities were so poor and the residents neglected to a such degree that any services provided were worthless. The Housers paid the Facilities' employees and vendors untimely, if at all, and residents received greatly reduced, if any, services in return.  Even where services are billed per diem, reasonable persons would know that supplying limited, or no, basic services would fail to comport with the very essence of the provider and benefit agreements, and that seeking reimbursement for such deficient services would constitute fraud.  See Broadrick v. Oklahoma, 413 U.S. 601, 608 (1973) ("[E]ven if the outermost boundaries of [a statute are] imprecise, any such uncertainty has little relevance . . . where appellants' conduct falls squarely within the 'hard core' of the statute's proscriptions.").  Additionally, § 1347's *mens rea* requirement further blunts any notice concern.  Count one alleges that the Housers knew the Facilities were providing inadequate care and were submitting reimbursements claims for essentially worthless services.  (See Supr. Indict. ¶ 93.)  Moreover, pursuant to the Eleventh

AO 72A
(Rev.8/8
2)

Circuit's holding in Medina, to convict defendants of health care fraud, the Government must prove they knew those claims were, in fact, false.  See Medina, 485 F.3d at 1297.

Likewise, there is no risk of arbitrary prosecution here.  To prosecute worthless services fraud in violation of § 1347, the Government must prove that the Housers knowingly provided bundled services completely lacking value, yet sought reimbursement for those worthless services.  That is not an arbitrary standard which will result in discriminatory enforcement.  Significantly, the Government is not alleging that the Housers failed to keep the Facilities in perfect compliance with the Programs' standards, or permitted minor regulatory violations.  Indeed, the First Superceding Indictment alleges that administrators at the Facilities repeatedly informed the Housers of care so deficient it resulted in immediate jeopardy situations and the involuntary termination of the Facilities from the Programs.  The Government is not attempting apply criminal sanctions to a *de minimus* regulatory deficiency, as defendants imply.  (See Defs.' Reply 6.)  Rather, the Government is prosecuting the Housers for failing to provide services of any value and seeking reimbursement for those worthless services, acts which would constitute fraud in violation of § 1347.

27

In sum, defendants had actual notice that their alleged behavior constituted health care fraud in violation of § 1347.  Moreover, "worthless services" fraud is adequately defined to prevent arbitrary and discriminatory enforcement of that statute.  Therefore, § 1347 is not unconstitutionally vague as applied to the Housers.  Accordingly, the undersigned **RECOMMENDS** that defendants' joint Motion to Dismiss Indictment [77] be **DENIED**.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, the undersigned **RECOMMENDS** that defendants' joint Motion to Dismiss Indictment [77] be **DENIED**.

**SO RECOMMENDED**, this 18th day of March, 2011.

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

GEORGE D. HOUSER and
RHONDA HOUSER,

               Defendants.

CRIMINAL ACTION FILE

NO. 4:10-CR-012-HLM-WEJ

## ORDER FOR SERVICE OF
## <u>NON-FINAL REPORT AND RECOMMENDATION</u>

Let this Non-Final Report and Recommendation of the United States Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B) and the Court's Local Criminal Rule 58.1A(3)(a) and Fed. R. Crim. P. 59, be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Non-Final Report and Recommendation within fourteen days of the receipt of this Order.  Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to any transcripts if applicable) and shall be served upon the opposing party.  The party filing objections

will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court.  If no objections are filed, the Non-Final Report and Recommendation may be adopted as the opinion and order of the District Court, and any appellate review of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam).

The Clerk is **DIRECTED** to submit the Non-Final Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED,** this 18th day of March, 2011.


WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

2