## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ROME DIVISION

UNITED STATES OF
AMERICA,

v.

CRIMINAL ACTION NO.
4:10-CR-012-HLM

GEORGE D. HOUSER
and RHONDA HOUSER.

## ORDER

This case is before the Court on Defendants' Motion to

Dismiss Indictment ("Motion to Dismiss") [77], on the Non-

Final Report and Recommendation of United States

Magistrate Judge Walter E. Johnson [102], and on

Defendants' Objections to the Non-Final Report and

Recommendation [120].

## I. Standard Governing Review of a Report and Recommendation

28 U.S.C.A. § 636(b)(1) requires that in reviewing a magistrate judge's report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C.A. § 636(b)(1). The Court therefore must conduct a de novo review if a party files "a proper, specific objection" to a factual finding contained in the report and recommendation. Macort v. Prem, Inc., 208 F. App'x 781, 784 (11th Cir. 2006); Jeffrey S. by Ernest S. v. State Bd. of Educ., 896 F.2d 507, 513 (11th Cir. 1990); United States v. Gaddy, 894 F.2d 1307, 1315 (11th Cir. 1990); LoConte v. Dugger, 847 F.2d 745, 750 (11th Cir. 1988). If no party files a timely

2

objection to a factual finding in the report and recommendation, the Court reviews that finding for clear error. Macort, 208 F. App'x at 784. Legal conclusions, of course, are subject to de novo review regardless of whether a party specifically objects. United States v. Keel, 164 F. App'x 958, 961 (11th Cir. 2006); United States v. Warren, 687 F.2d 347, 347 (11th Cir. 1982).

## II. Background

### A. Procedural Background

On April 14, 2010, a federal grand jury sitting in the Northern District of Georgia returned a nine-count Indictment against Defendants George D. Houser ("Mr. Houser") and Rhonda Houser ("Mrs. Houser"). (Docket

3

Entry No. 1.)[1]   Count one of the Indictment charges defendants with conspiracy (18 U.S.C. § 1349) to defraud health care benefit programs in violation of 18 U.S.C. § 1347.  (Id.)  On November 29, 2010, Defendants filed a Motion to Dismiss as to count one, healthcare fraud. (Docket Entry No. 76.)   On January 7, 2011 the Government filed a response to Defendants' Motion to Dismiss.  (Docket Entry No. 83.)  On January 31, 2011, Defendants filed a reply.  (Docket Entry No. 93.)

On January 18, 2011,  a federal grand jury sitting in the Northern District of Georgia returned a First Superseding Indictment against Defendants alleging the same charges.

---

[1]Because Defendants' Motion to Dismiss does not address counts two through eleven, the Court does not evaluate those counts.

4

(Docket Entry No. 86.) On March 18, 2011, Magistrate Judge Walter E. Johnson ("Judge Johnson") issued a Non-Final Report and Recommendation. (Docket Entry No. 102.) Judge Johnson recommends that Defendants' Motion to Dismiss be denied. (Id.) On March 31, 2011, Defendants filed their Objections to the Non-Final Report and Recommendation (the "Objections"). (Docket Entry No. 120.) The Government has indicated that it does not plan to file a response. The briefing process for the Motion is therefore complete.

On May 17, 2011 the Court held a hearing on the Motion to Dismiss. During that hearing, the Court heard oral argument from Defendants' counsel and the

Government's counsel. The Court now finds that the Motion to Dismiss is ripe for resolution.

## B. Factual Background

In count one, the First Superseding Indictment alleges that, from June 2004 until September 2007, Defendants knowingly conspired to execute and attempt to execute a scheme to defraud health care benefit programs affecting commerce, and to obtain by false representations payment for the delivery of worthless services in violation of 18 U.S.C. § 1347. (Supr. Indict. ¶¶ 1, 36.)

### 1. The Facilities

Defendants created Forum Healthcare Group, Inc. ("Forum Healthcare") in March 2003. (Supr. Indict. ¶ 2.) Through Forum Healthcare and, after 2004, Forum Group,

6

Defendants owned and managed three nursing homes (collectively, "the Facilities") doing business as Mount Berry Convalescent Center ("Mount Berry"), Moran Lake Convalescent Center ("Moran Lake"), and Wildwood Park Nursing and Rehabilitation Center ("Wildwood"). (Id.) The Facilities were licensed nursing homes under federal and state law and were certified to participate in the Medicare and Georgia Medicaid programs (the "Programs"). (Id. ¶ 5.) Mr. Houser served as owner and chief executive officer of Forum Healthcare and Forum Group, and Mrs. Houser served as Corporate Secretary. (Id. ¶¶ 10-11.) By September 2007, Medicare and Georgia Medicaid had terminated all three of the Facilities for failing to be in

substantial compliance with the requirements of the Programs. (Id. ¶¶ 6-7.)

## 2. Agreements with the Programs

On July 1, 2004, Mr. Houser, acting as President of Forum Group, submitted Provider/Supplier Enrollment Applications to Medicare on behalf of the Facilities. (Supr. Indict. ¶ 28.) Acceptance to Medicare allowed the Facilities to file claims for services provided to residents who qualified for those funds. (Id.) In signing those applications, Mr. Houser agreed to abide by applicable laws and regulations, and certified as follows: "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with

8

causing some employees' paychecks to bounce. (Id. ¶ 41.) The situation worsened in 2005, when Defendants decreased the amount of funds they deposited into those accounts and sometimes made late deposits. (Id.) On June 16, 2005, Mount Berry's administrator faxed Defendants a memorandum stating that she and her staff would no longer sign employee paychecks unless they were assured that sufficient funds were available to reimburse those checks. (Id. ¶ 43.) On July 5, 2005, Mount Berry's administrators faxed Defendants a memorandum stating that several managers had resigned because of the payroll situation. (Id. ¶ 44.) That month, Defendants employed a mobile check cashing service, EMK Group Limited, for the Facilities. (Id. ¶ 45.) When the "money van" arrived,

13

employees would rush out of the Facilities to cash their paychecks. (Id.)

At various times, Defendants failed to pay Social Security and payroll taxes and failed to remit health insurance premiums on behalf of the Facilities' employees, while still deducting those monies from their paychecks. (Supr. Indict. ¶ 49.) On July 13, 2005, Mount Berry's administrator faxed a memorandum to Defendants relaying complaints that the health insurance premiums deducted from employees' paychecks were not being remitted to their insurers. (Id. ¶ 50.) On September 14, 2005, that administrator again sent a fax to Defendants informing them of employees' complaints that their health benefits claims were being rejected for lack of insurance. (Id. ¶ 51.)

### c. Vendors

The Government alleges that Defendants routinely failed to pay vendors, including those providing food and power. (Supr. Indict. ¶¶ 55-65.) According to the Government, at various times Defendants ignored requests and failed to pay expenses as they became due, including those for food, laboratory services, medical waste and trash disposal, pharmacy services, and nursing supplies. (Id. ¶ 56.)

In a December 13, 2004 letter, Mount Berry's fire alarm monitoring service notified Mr. Houser that it had discontinued service due to outstanding invoices. (Supr. Indict. ¶ 57.) On December 15, 2004 Mr. Houser e-mailed

Mount Berry's administrator a list of unpaid vendors, stating

as follows:

> I'm planning to pay these early next week to return
> the home to normalcy. Would this do it? Is
> anyone left off the list that should be on it? Is
> anyone on the list that should be left off? I'm
> doing this because I don't want the State to think
> I am not paying the bills and try to remove Forum,
> although some apparently think they should.

(Id.)

The Government alleges that the Facilities had

constant food shortages. (Supr. Indict. ¶ 58.) Based on the

number of residents at Mount Berry and Moran Lake, the

Government alleges that those two facilities spent

significantly less per resident on food than the national

average for nursing homes. (Id.) In June 2005, Mount

Berry and Moran Lake contracted with Sysco Food Services

16

for food delivery because their prior food vendor, U.S. Foodservice, would no longer do business with them due to delinquent accounts. (Id. ¶ 59.) However, Mount Berry and Moran Lakes's accounts with Sysco also became delinquent, and Sysco notified them that food services could be cancelled. (Id. ¶ 61.) In response, Mr. Houser sent Sysco a signed personal financial statement dated May 2, 2006, indicating that his net worth was more than $26 million. (Id.)

Likewise, Mount Berry and Moran Lake's accounts with Georgia Power became delinquent. (Supr. Indict. ¶ 62.) Beginning in January 2007, Georgia Power shut off power at locations inside Mount Berry and Moran Lake that it believed would not impact the immediate health and welfare

17

of their residents, such as the laundry rooms and storage area. (Id. ¶ 63.) Georgia Power also canceled service at Forum Group's corporate office. (Id.)

## 4. Diversion of Funds

The Government alleges that, during the time Defendants operated and managed the Facilities, Defendants diverted funds from the Facilities to themselves, for personal use. (Supr. Indict. ¶¶ 66-81.) According to the Government, Defendants used the Facilities' bank account to purchase expensive automobiles (id. ¶¶ 68), pay alimony to Mr. Houser's ex–wife (id. ¶ 69), pay their children's care giver (id. ¶ 70), and provide money to Mrs. Houser for her personal use. (id. ¶ 71.)

18

The Government alleges that, on June 14, 2004, Mr. Houser transferred $1,400,000 from the Forum Healthcare bank account to a personal account in his name. (Supr. Indict. ¶ 72.) Between June 2004 and February 2005, the Government alleges that Mr. Houser purchased properties in Atlanta and Rome, paying almost $1.4 million in down payments. (Id. ¶¶ 72-75.) Mrs. Houser, a licensed real estate agent, allegedly received nearly $100,000 in commission from those transactions. (Id.) Additionally, on July 12, 2005, the Government contends that Mr. Houser used two Medicare checks (totaling $108,924.66) as earnest money to purchase property in Rome. (Id. ¶ 76.)

## 5. ORS Surveys

The Government alleges that the Georgia Department of Human Resource's Office of Regulatory Services ("ORS") received numerous complaints about the Facilities from families, staff, and vendors. (Supr. Indict. ¶ 82.) According to the Government, the ORS "is responsible for performing the certification and survey function of nursing homes in Georgia on a periodic basis, and more frequently when there are complaints or other triggering events." (Id. ¶ 24.) Those surveys can result in citation by ORS and lead to enforcement actions ranging from civil penalties to decertification from the Programs. (Id. ¶ 25.)

In May 2007, the Government alleges that ORS surveyed Mount Berry and Moran Lake due to an increase

in the volume and severity of complaints. (Supr. Indict. ¶ 85.) A May 23, 2007 ORS survey of Mount Berry identified two "immediate jeopardies" regarding nutrition and administration and nineteen other deficiencies. (Id. ¶ 87.) An immediate jeopardy situation is one in which a "provider's non-compliance with one or more requirements of participation [in Medicare and Medicaid] has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 489.3.

Likewise, a May 23, 2007 ORS survey of Moran Lake revealed five immediate jeopardies in addition to other deficiencies. (Supr. Indict. ¶ 86.) The following conditions at Moran Lake were labeled immediate jeopardies: (1) "Sanitary conditions with respect to food preparation and

service;" (2) "Infection control and the failure to ensure the process[ing] & handling of laundry and linen in a manner that prevented the potential spread of infection;" (3) "Governing Body failed to ensure the provision/payment of basic necessities to ensure kitchen and laundry sanitation, as well as dietary and environmental needs of the residents;" (4) "Facility failed to maintain a quality assurance program that identified and implemented corrective measures for repetitive and long term problems;" and (5) "Facility failed to ensure that automatic release door mechanisms were functioning properly to allow residents & staff to exit the building during emergencies[.]" (Id.)

In a June 8, 2007 statement, Centers for Medicare and Medicaid Services ("CMS") informed the administrators of

Mount Berry and Moran Lake of ORS's formal findings and required substantial compliance with correction plans by June 15. (Supr. Indict. ¶ 88.) On June 15, CMS notified those administrators that Mount Berry and Moran Lake were terminated from the Programs effective immediately. (Id. ¶ 89.)

On August 20, 2007, ORS conducted a follow-up survey of Wildwood and determined that, although immediate jeopardy situations identified two weeks earlier had been corrected, the nursing home was not in substantial compliance with requirements for participation in the Programs. (Supr. Indict. ¶ 90.) ORS directed Wildwood to execute a correction plan. (Id.) A September 4, 2007 survey nevertheless identified immediate jeopardy

23

situations at Wildwood. (Id.) On September 10, 2007, CMS informed Wildwood's administrator that the facility was terminated from the Programs. (Id. ¶ 91.)

The Government alleges that, despite the lack of adequate services, between June 2004 and September 2007, the Facilities submitted claims for care and services to the Programs, which in turn paid the Facilities more than $30 million. (Supr. Indict. ¶¶ 92, 95.) According to the Government, Defendants had actual knowledge that the care and services provided by the Facilities were so inadequate or deficient as to be rendered worthless. (Id. ¶ 93.)

## III. Discussion

In their Objections to the Non-Final Report and Recommendation ("Objections"), Defendants make two primary arguments. First, Defendants point out that the Non-Final Report and Recommendation cites the current version of 18 U.S.C. § 1347, and argue that application of the amended statute violates Defendants' constitutional rights. Second, Defendants assert that § 1347 is unconstitutionally vague as applied to them. For the reasons discussed in Judge Johnson's thorough and well-reasoned Non-Final Report and Recommendation, the Court finds that the statute is not unconstitutionally vague and denies Defendants' Motion to Dismiss.

## A. Current Version of § 1347

In the Non-Final Report and Recommendation, Judge

Johnson included the current version of § 1347. The

current version of §1347 provides:

(a) Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

> (1) to defraud any health care benefit program; or

> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not

> more than 20 years, or both; and if the
> violation results in death, such person shall
> be fined under this title, or imprisoned for any
> term of years or for life, or both.
>
> (b) With respect to violations of this section, a
> person need not have actual knowledge of this
> section or specific intent to commit a violation of
> this section.

18 U.S.C. § 1347. Congress added § 1347(b) by amendment on March 23, 2010. Pub. L. 111-148 § 10606(b)(2).

Defendants argue that application of that amendment to Defendants violates the ex post facto clause and the Due Process Clause. Additionally, Defendants argue that the amendment raises a legal question as to the interplay and between § 1347(a) and § 1347(b).

The Court finds that the amended statute does not apply to Defendants. A defendant cannot be retroactively charged under an amended statute when the amendment lessens the mens rea required for conviction. Here, the amended statute arguably lessens the mens rea, and the Government's allegations involve conduct that took place between June 2004 and September 2007, prior to the 2010 amendment. The inclusion of the amended statute in the Non-Final Report and Recommendation was the result of a clerical error. The Court finds that the Indictment charges Defendants with a violation of the prior version of § 1347,[2]

---

[2]That version of the statute states:

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice--
>
> (1) to defraud any health care benefit

28

and that Defendants' arguments about the amended statute

are consequently inapplicable. The Court therefore

overrules Defendants' Objections based on Judge

_____

program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.

18 U.S.C. § 1347 (2010).

Johnson's citation to the current version of 18 U.S.C. §
1347.

## B. Vagueness

### 1. Standard

The Supreme Court has instructed that to satisfy due
process concerns and avoid vagueness, a penal statute
must both (1) "define the criminal offense with sufficient
definiteness that ordinary people can understand what
conduct is prohibited," and (2) do so "in a manner that does
not encourage arbitrary and discriminatory enforcement."
Kolender v. Lawson, 461 U.S. 352, 357 (1983); see also
United States v. Di Pietro, 615 F.3d 1369, 1371 (11th Cir.
2010). Additionally, the Court has recognized the second
prong of the void-for-vagueness doctrine as more important

30

because it prevents "'a standardless sweep [that] allows

policemen, prosecutors, and juries to pursue their personal

predilections.'" Kolender, 461 U.S. at 358 (quoting Smith v.

Goguen, 415 U.S. 566, 575 (1974)); see also United States

v. Fisher, 289 F.3d 1329, 1333 (11th Cir. 2002). Where a

statute falls below these standards, a criminal defendant

may challenge it as unconstitutionally vague on its face or

as applied to his own individual facts and circumstances. Di

Pietro, 615 F.3d at 1371.

## 2. Worthless Services Claim Under § 1347

Section 1347 provides as follows:

Whoever knowingly and willfully executes, or
attempts to execute, a scheme or artifice--

   (1) to defraud any health care benefit
   program; or

31

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.

18 U.S.C. § 1347 (2010). As Judge Johnson explained:

Section 1347 clearly applies to instances where a provider submits claims for individual services that were not performed. See United States v. Soto, 399 F. App'x 498, 500-01 (11th Cir. 2010) (per curiam) (upholding health care fraud conspiracy conviction where defendant billed Medicare for equipment and services never provided to patients). The question here is whether § 1347 is unconstitutionally vague as applied to the Housers'

claims for reimbursement of allegedly deficient bundled services.

(Non-Final Report and Recommendation at 19.)

In <u>United States v. NHC Health Care Corp.</u>, 163 F. Supp. 2d 1051 (W.D. Mo. 2001), the court explained the difficulty of assessing fraud in the provision of bundled nursing home services in the civil context, under the analogous False Claims Act ("FCA")[3], as follows:

> The difficulty in proving that Defendants committed such a fraud lies in the per diem billing system utilized under Medicare/Medicaid. Obviously, if NHC billed the Government $4 for turning Resident 1 on July 18, 1998, but in fact no one actually performed the task, a clear cut case of fraudulent billing would be presented. However, we are not blessed with such pristine

---

[3] The FCA imposes civil liability for knowingly presenting, or causing to be presented, a fraudulent claim for payment to the Government, or for making a false statement in order to be paid for such a claim.  31 U.S.C. § 3729(a)(1)(A)-(B).

33

circumstances. NHC billed the Medicare/Medicaid programs for the over-all care of each of these residents on a per diem basis. As previously stated by this Court, in so doing NHC agreed to provide "the quality of care which promotes the maintenance and the enhancement of the quality of life." *Id.* at 1153. At some very blurry point, a provider of care can cease to maintain this standard by failing to perform the minimum necessary care activities required to promote the patient's quality of life. When the provider reaches that point, and still presents claims for reimbursement to Medicare, the provider has simply committed fraud against the United States. Whether the Government has demonstrated that a factual dispute remains as to whether NHC crossed into this admittedly grey area, is the proper focus of this Order.

163 F. Supp. 2d at 1055-56. Judge Johnson further

explained how courts evaluate worthless services claims:

Other courts examining similar allegations of fraud under the FCA have reached the same conclusion—at some point, services rendered by a nursing home can be "so deficient that for all practical purposes it is the equivalent of no

performance at all." Mikes v. Straus, 274 F.3d 687, 703 (2d Cir. 2001). Thus, billing for such "worthless services" is fraud. See id.; United States ex rel. Lee v. SmithKline Beecham, Inc., 245 F.3d 1048, 1053 (9th Cir. 2001); United States ex rel. Swan v. Covenant Care, Inc., 279 F. Supp 2d 1212, 1221 (E.D. Cal. 2002); cf. James E. Utterback, Substituting an Iron Fist for the Invisible Hand: The False Claims Act and Nursing Home Quality of Care, 10 Quinnipiac Health L.J. 113, 156 (2007) (suggesting that "[p]roof in a worthless services claim should go to the very essence of the basis for which payment was made, supporting the argument that the government would not pay if it had known. . . .[i.e.,] evidence that the quality of care in an isolated event fell so far below the norm as to be grossly negligent or reckless in conduct. Such proof also may be established by showing a pattern of less egregious but widespread substandard quality findings that in the aggregate would give rise to an immediate jeopardy citation.").

(Non-Final Report and Recommendation at 20-21.)

The parties have only found one case in which a court

has considered the worthless services doctrine in a criminal

35

case. In <u>United States v. Wachter</u>, 4:05CR667SNL, 2006

WL 2460790 (E.D. Mo. Aug. 23, 2006), the court used the

"worthless services" doctrine developed in the civil context

and upheld the Government's criminal indictment on a

worthless services theory under § 1347. The court found

that, like in the civil context, a defendant can be charged for

health care fraud in the criminal context if the defendant

makes a knowing reimbursement claim for worthless

services. <u>Id.</u> at *11. The court defined worthless services

as "services that were so deficient that they were of no utility

to the resident, or were totally undesirable." <u>Id.</u>

Additionally, the court rejected the defendants'

vagueness claim and stated:

Applying the "worthless services" doctrine to
the criminal statutes the indictment alleges

defendants conspired to violate does not render them void for vagueness. "Worthless" is defined as "[t]otally lacking worth; of no use or value." *Black's Law Dictionary*, (8th ed. 2004). Value means "[t]he significance, desirability, or utility of something." *Id.* These are common terms whose definition is readily known to ordinary men. Worthless services could include services that were so deficient that they were of no utility to the resident, or were totally undesirable.

Here, "men of common intelligence" could reasonably understand when their conduct could result in worthless services, or services completely lacking value. "Objections to vagueness . . . rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." "In determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct [with] which a defendant is charged." Here, the indictment alleges that defendants concealed and misrepresented the conditions and care provided. In light of these alleged facts, defendants were on notice that their conduct was at risk for criminal liability.

Wachter, 2006 WL 2460790 at *11. Judge Johnson

stressed the importance of scienter in the Wachter court's

rejection of the defendants' vagueness defense. Judge

Johnson explained:

> The Wachter court reasoned that any difficultly in
> distinguishing between merely bad nursing care
> services and those that were worthless was
> mitigated by § 1347's scienter requirement. 2006
> WL 2460790, at *11-12 (observing that notice of
> possible criminal liability and knowledge that care
> was substandard could be inferred from
> defendants' attempts to conceal the poor
> conditions). While a scienter requirement does
> not necessarily validate a criminal statute against
> all vagueness challenges, it does eliminate the
> objection that the statute punishes the defendant
> for an offense of which he was unaware. Colautti
> v. Franklin, 439 U.S. 379, 395 (1979) ("This Court
> has long recognized that the constitutionality of a
> vague statutory standard is closely related to
> whether that standard incorporates a requirement
> of *mens rea*."); Screws v. United States, 325 U.S.
> 91, 102 (1945) ("The requirement that the act must
> be willful or purposeful may not render certain, for

38

all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware."); see also United States v. Conner, 752 F.2d 566, 574 (11th Cir. 1985) (citing those cases in vagueness inquiry).

(Non-Final Report and Recommendation at 22-23.) Defendants argue that Wachter is distinguishable from this case, and that § 1347 is unconstitutionally vague. The Court evaluates whether Defendants had actual notice that their conduct was at risk for criminal liability, and whether the statute encourages arbitrary prosecution.

### 3. Defendants' Arguments

First, Defendants argue that the "blurry point" or "gray area" recognized in NHC Health Care Corp. demonstrates that "worthless services" does not provide an acceptable

39

standard for assessing criminal fraud, where defendants are entitled the benefit of foresight. (Objections at 12.) According to Defendants, there is no way to know when substandard services cross the line from merely bad to criminally worthless. Defendants assert that a criminal worthless services claim has only been evaluated in one case and has never been addressed by a federal appeals court. Defendants argue that Judge Johnson's citations to civil cases fail to provide any guidance in addressing the legal issue presented: whether the worthless services standard provides sufficient notice to defendants in a criminal case. (Id. at 11.) According to Defendants, the scienter requirement does not mitigate vagueness because it is meaningless to argue that the accused specifically

intended an act if the individual did not know that the act was subject to criminal liability in the first place. (Id. at 15.)

Second, Defendants argue that Judge Johnson's reliance on Wachter is misplaced because this case is distinguishable from Wachter. (Objections at 13.) Judge Johnson relied on the Wachter court's finding that "the scienter requirement, knowledge, mitigates any vagueness that might be present." Wachter, 2006 WL 2460790 at *11. In Wachter, however, there was evidence that the defendants told staff not to report abuse and to guard what they said to state surveyors. The Wachter court found that, because defendants concealed and misrepresented the conditions and care provided, the defendants were on notice that their conduct was at risk for criminal liability. Id.

In contrast, Defendants argue that the Government does not allege that Defendants misled regulators or falsified information. Defendants therefore assert that scienter does not mitigate the vagueness concerns in this case as it did in Wachter.

Third, Defendants argue that § 1347's inconsistency with the regulatory regime encourages arbitrary prosecution and provides defendants no notice of when their conduct is at risk for criminal liability. According to Defendants, the allegations of deficiencies or substandard care at the Facilities were brought to the attention of the regulatory agencies, and those agencies took administrative action to correct the problem at the time of the allegations. (Objections at 13.) Although the regulatory agencies

42

inspected the Facilities and found deficiencies, the Programs continued to compensate Defendants for services provided until 2007, when the Programs determined that the violations were egregious enough to terminate the Facilities. (Id.) Defendants assert that, prior to 2007, Defendants could not have known that the services were worthless if the regulatory agencies continued to pay Defendants' claims. Defendants therefore argue that the Government's retroactive, arbitrary assertion of criminal liability under § 1347 violates Defendants' constitutional rights. (Id.)

## 4. Analysis

### a. Actual Notice & the "Gray Area"

The Court agrees with Judge Johnson that Defendants had actual notice that their conduct was at risk for criminal

43

liability because, based on the Government's allegations, an ordinary person would reasonably understand that Defendants submitted claims for worthless services. In Wachter, the Court defined worthless services as "services that were so deficient that they were of no utility to the resident, or were totally undesirable." Wachter, 2006 WL 2460790 at *11; see also Mikes, 274 F.3d at 703 ("In a worthless services claim, the performance of the service is so deficient that for all practical purposes it is equivalent of no performance at all.") Here, Judge Johnson correctly reasoned that, "viewing the allegations in a light most favorable to the Government, conditions at the Facilities were so poor–i.e., food shortages, limited electricity, poor sanitary conditions, staff shortages, safety concerns,

etc.–that, in essence, any services actually rendered were

of no value." (Non-Final Report And Recommendation at

25.) Although there is some "gray area" between bad and

worthless services, given the severe nature of the alleged

deficiencies at the Facilities, the Court agrees with Judge

Johnson that a reasonable person would understand that

Defendants provided worthless services. Judge Johnson

explained:

[U]nder the above circumstances, ordinary people
would have understood that the overall conditions
at the Facilities were so poor and the residents
neglected to a such degree that any services
provided were worthless. The Housers paid the
Facilities' employees and vendors untimely, if at
all, and residents received greatly reduced, if any,
services in return. Even where services are billed
per diem, reasonable persons would know that
supplying limited, or no, basic services would fail
to comport with the very essence of the provider
and benefit agreements, and that seeking

> reimbursement for such deficient services would
> constitute fraud. See Broadrick v. Oklahoma, 413
> U.S. 601, 608 (1973) ("[E]ven if the outermost
> boundaries of [a statute are] imprecise, any such
> uncertainty has little relevance . . . where
> appellants' conduct falls squarely within the 'hard
> core' of the statute's proscriptions.").

(Non-Final Report and Recommendation at 26.)

Additionally, the Court agrees with Judge Johnson that

"§ 1347's mens rea requirement further blunts any notice

concern." (Non-Final Report and Recommendation at 26.)

Undisputably, Defendants knew or should have known that

submitting claims for worthless services would result in

criminal liability.[4] The issue is whether Defendants could

have known at what point their services constituted

---

[4]In addition to the myriad regulations and disclaimers cited by
the Government, a reasonable person would know that seeking
compensation from the Government for services that are worthless
constitutes fraud.

worthless services and exposed them to liability. To convict Defendants of healthcare fraud under § 1347, the Government must prove not only that Defendants submitted claims for worthless services, but that Defendants knew that the services were worthless, and nevertheless submitted claims. United States v. Medina, 485 F.3d 1291, 1297 (11th Cir. 2007). The knowledge requirement adds an element of culpability and mitigates the vagueness concerns. See Screws, 325 U.S. 91 at 103 ("[W]here the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from a lack of warning or knowledge that the act which he does is a violation of law.") Defendants could escape liability if they presented evidence that,

although the services were worthless, based on their inspections and discussions with employees and administrators, they had no knowledge that the services were useless. See e.g., Mikes, 274 F.3d at 703 ("Defendants have presented such overwhelming evidence of their genuine belief that their use of spirometry had medical value, we conclude as a matter of law they did not submit their claims with the requisite scienter.")[5]. Without the scienter requirement, the "gray area" would risk subjecting unknowing defendants to criminal liability. The

_____

[5]In Mikes, the defendants presented evidence that they held a good faith belief that the allegedly worthless spirometry tests were of medical value. Mikes, 274 F.3d at 704. The Defendants presented evidence that they had attempted to comply with regulations, pursued any complaints, and tried to rectify the problems, but that they found no faults. Id. The court consequently found for defendants because plaintiffs failed to prove that the defendants knowingly submitted Medicare claims for worthless services. Id.

48

scienter requirement, however, mitigates any notice concerns by requiring the Government to prove that Defendants had warning that the services were useless, and nevertheless continued to submit claims. The Court therefore finds that, because of the scienter requirement, the standard for a worthless services violation under § 1347 is sufficiently definite to provide Defendants actual notice of the prohibited conduct.

## b. Distinctions for Wachter

Defendants correctly assert that the Government's allegations of affirmative subterfuge are probably weaker than the allegations in Wachter.[6] The distinctions between

---

[6]The Government alleges that paragraph 57 of the First Superseding Indictment alleges a cover up. Although this allegation demonstrates Defendants' purported desire to satisfy state regulators, it certainly does not allege intentional

49

this case and Wachter, however, are nevertheless

insufficient to demonstrate that Defendants lacked actual

notice. Viewing the allegations in a light most favorable to

the Government, Defendants knew of the staff shortages,

limited electricity, poor sanitary conditions, and safety

concerns at the Facilities from communication with

administrators, state survey reports, complaints from

families, staff, and vendors, and attendance at meetings.

Despite this knowledge, the Government alleges that

Defendants did not take steps to rectify the deficient

conditions. "Rather, the Housers diverted more than $1.4

million in funds from Forum Healthcare's bank account for

their personal use (including real estate and automobile

_____

misrepresentation or a coverup.

50

purchases, payments to Mr. Houser's ex-spouse, and child care expenses, etc.)." (Non-Final Report and Recommendation at 25.) Those allegations demonstrate that, like the defendants in Wachter, Defendants knew they were providing worthless services, but wilfully allowed the deficiencies to persist and continued to submit claims.[7] The Court therefore agrees with Judge Johnson that, despite any differences between this case and Wachter, the Government's allegations are sufficient to establish that Defendants had actual notice that their actions constituted healthcare fraud under § 1347.

---

[7] In Mikes, on the other hand, the defendants addressed all complaints and tried to rectify the problems, and the court found that the defendants did not knowingly submit claims for worthless services.

## c. Arbitrary Prosecution & Regulatory Compliance

First, the Court agrees with Judge Johnson that "there is no risk of arbitrary prosecution here," because "the Government is not attempting [to] apply criminal sanctions to a de minimus regulatory deficiency", or "alleging that the Housers failed to keep the Facilities in perfect compliance with the Programs' standards." (Non-Final Report and Recommendation at 27.) Rather, criminal liability under § 1347 is distinct from any regulatory deficiencies and requires "the Government to prove that the Housers knowingly provided bundled services completely lacking value, yet sought reimbursement for those worthless services." (Id.); see also Mikes, 274 F.3d at 703 ("[A] worthless services claim asserts that the knowing request

52

of federal reimbursement for a procedure with no medical value violates the Act irrespective of any certification.") (emphasis added).[8]   "That is not an arbitrary standard which will result in discriminatory enforcement."  (Id.)

Second, despite any inconsistency with the regulatory regime, § 1347 provides sufficient notice to Defendants. As discussed above, the Government alleges that Defendants

---

[8] Courts that have addressed the issue have drawn a distinction between fraud under the FCA and regulatory compliance. See United States ex rel. Swan v. Covenant Care, Inc., 279 F. Supp. 2d 1212, 1221 ("The False Claims Act only attaches liability to false claims for payment, not to underlying activity that allegedly violates federal law.") Courts have been skeptical of false certification claims, which assess liability for regulatory violations when government payment is expressly conditioned on a false certification of regulatory compliance. Id. In those cases, courts have been uncomfortable attaching civil liability because it would "improperly permit qui tam plaintiffs to supplant regulatory discretion . . ." Id. Courts, however, have been more amenable to fraud claims, like the one in this case, which are separate from regulatory compliance.

submitted claims despite knowledge of severe deficiencies, including staff shortages, limited electricity, and sanitation problems. Although the regulators had not yet shut-down the Facilities, a reasonable person would understand that seeking reimbursement for resident care that allegedly provided limited or no basic services constitutes fraud. Defendants can use the Facilities' compliance with the regulatory regime as factual evidence to dispute the alleged severity of the deficiencies and to argue that Defendants did not know that the Facilities provided worthless services. Alternatively, the Government can argue that the ORS reports, which list the problems at the Facilities, establish that Defendants had knowledge that the deficiencies were so severe that the services were of no utility to the

residents. At this stage, however, the Court finds that, regardless of any regulatory compliance, the definition of worthless services is sufficiently definite for Defendants to have actual notice of when they submitted claims for allegedly worthless services.

## d. Summary

For the reasons discussed above, the Court overrules Defendants' Objections based on vagueness. First, Judge Johnson correctly determined that Defendants had actual notice that their alleged behavior constituted health care fraud in violation of § 1347. Second, Judge Johnson correctly found that "worthless services" fraud is adequately defined to prevent arbitrary and discriminatory enforcement of that statute. The Court therefore agrees with Judge

55

Johnson that § 1347 is not unconstitutionally vague as applied to Defendants.

## IV. Conclusion

ACCORDINGLY, the Court **ADOPTS** the Non-Final Report and Recommendation of United States Magistrate Judge Walter E. Johnson [102], **OVERRULES** Defendant's Objections to the Non-Final Report and Recommendation [120], and **DENIES** Defendant's Motion to Dismiss [77].

IT IS SO ORDERED, this the 23 day of May, 2011.

_____
UNITED STATES DISTRICT JUDGE